# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

CORA Y. CURTIS,                          )
                                          )
                    Plaintiff,            )
                                          )
            vs.                           )            Case No. 1:09-cv-512-TWP-DML
                                          )
CLARIAN HEALTH - INDIANA                  )
NEUROLOGY CLINIC,                         )
                                          )
                    Defendant.            )


## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on defendant, Clarian Health Partners, Inc.[1] ("Clarian" or "Defendant"), Motion for Summary Judgment [Dkt. 33]. Plaintiff, Cora Y. Curtis ("Curtis"), filed suit in this Court alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 United States Code Section 2000e, *et seq.* For the reasons set forth below, Defendant's Motion for Summary Judgment [Dkt. 33] is **DENIED**.

## I. BACKGROUND

Curtis is an African-American nurse hired by Clarian on February 4, 2005. Curtis Dep. at 14–15. On October 16, 2006, Curtis transferred to the Neurology Clinic as a Registered Nurse–Associate Partner, commonly referred to as a Triage Nurse. *Id.* at 27–28. During the times relevant to this suit, there were two other Triage Nurses in the Neurology Clinic, Kristi Keller ("Keller") and Diana Clouse ("Clouse"), both of whom are Caucasian. McCartney Dep.

---

[1] Defendant is incorrectly identified in the Complaint as "Clarian Health - IU Neurology Clinic." Motion for Summary J. at 1.

at 29.  Curtis was initially hired and supervised by Carla VanAmburg ("VanAmburg").  Curtis

Dep. at 27.  In June 2007, Hope McCartney ("McCartney") replaced VanAmburg as Curtis'

supervisor, and McCartney continued to supervise Curtis until Curtis' termination.  McCartney

Dep. at 7.

*A.*      **Curtis Duties as a Triage Nurse**

Triage Nurses in the Neurology Clinic support particular doctors in the Clinic.  Curtis

initially was assigned to support three doctors: Dr. Hingtgen, Dr. Mattson, and Dr. Kincaid.

Curtis Dep. at 41, 73–74.  Some time prior to August 7, 2007, Curtis stopped supporting Dr.

Hingtgen but continued to support Dr. Mattson and Dr. Kincaid.  *Id.* at 41, 44.  Neither Keller

nor Clouse was assigned to support Dr. Mattson or Dr. Kincaid at any time relevant to this suit.

In Curtis' opinion, she had a good working relationship with both doctors and neither doctor was

biased against her because of her race.  *Id.* at 42–43.

Curtis' duties included responding to patient communications and thoroughly

documenting nursing actions through a procedure known as "charting."  *Id.* at 30, 33.  The

Neurology Clinic employed an electronic charting system called the Cerner Inbox System

("Inbox"), which was to be used to document all nursing actions.  McCartney Dep. at 17–18.

Consistent with her nursing training, Curtis understood that "*if you don't chart, then there is no

reason to believe that an action was done*."  Curtis Dep. at 32.  Inbox could be used to chart

nursing actions and for doctors to communicate with the Triage Nurses.  *See id.* at 53–54.  The

Inbox system was being implemented around the same time that Curtis arrived at the Neurology

Clinic, and it is undisputed that it took time for all Neurology Clinic personnel, including the

doctors, to become comfortable charting electronically rather than on paper.  VanAmburg Dep.

at 21–23.

In addition to the patient inquires received directly, medical assistants sometimes received requests from patients and transmitted those requests to Curtis. Curtis Dep. at 35–36. Additionally, the doctors themselves had some responsibility to return patient calls. McCartney Dep. at 86–87. Curtis notes that many patient inquiries resulted from patients failing to check messages or contact their pharmacies. Curtis Dep. at 61.

### B.    Curtis Training

In her initial training with Clarian, Curtis was given a copy of Clarian's Employee Handbook ("Handbook") and accepted responsibility for reading, understanding, and observing the procedures laid out in that document. *Id.* at 15–17. The Handbook also was available for viewing on Clarian's intranet. *Id.* Curtis had access to various Human Resources policies, including workplace discrimination policies and Clarian's Corrective Action Policy for disciplinary issues, on Clarian's intranet. *Id.* at 22–23; *see also* McCartney Dep. Ex. B (Corrective Action Policy).

Curtis was trained to use the Inbox system. McCartney Aff. Ex. 1. In her orientation checklist, Curtis acknowledged receiving training in various clinic procedures, including charting and telephone documentation. *Id.* However, Curtis alleges she never received formal job orientation. As part of a performance improvement plan, McCartney stipulated that she and Curtis would have weekly meetings to discuss performance issues that McCartney had identified. Curtis alleges the weekly meetings never took place. (Exhibit G, CLA002076). Although "*all clinics have to offer an orientation*," the specifics of training are left to each individual clinic. Greene-Jones Dep. at 28. It is undisputed that supervisors of other clinics,

3

including Angela Greene-Jones ("Greene-Jones") of the Orthopaedic Clinic, have training

programs that are more formalized than the training program at the Neurology Clinic. *Compare*

*id.* at 26–28, *with* McCartney Dep. at 50.

## C.    Performance Issues and Termination

Curtis did not have had any significant performance issues while VanAmburg was her

supervisor. VanAmburg never engaged in any formal discipline of Curtis. VanAmburg Dep. at

38. However, on May 16, 2007, VanAmburg expressed minor concerns with Curtis' work

during her annual performance review. Curtis Dep. at 68–70. VanAmburg noted that Curtis

needed to "continue to follow a check and balance system to ensure information in Inbox

message are [sic] accurate and complete and follow up are [sic] completed in a timely matter."

*Id.* at 66–67. VanAmburg made other comments regarding adjustments and changes Curtis had

made to her work, and Curtis interpreted these comments as positive. *Id.* at 67–69. In all,

VanAmburg concluded that Curtis met expectations. VanAmburg Dep. at 42.

Following VanAmburg's departure from the Neurology Clinic, McCartney became

Curtis' supervisor with the authority to evaluate, discipline, and fire Curtis. McCartney Dep.

19–20. When McCartney assumed her role as Curtis' supervisor, Curtis had no documented

Performance Improvement Plan as a result of formal discipline, and McCartney had not heard

any complaints regarding Curtis' work performance. *Id.* at 26, 66. None of the doctors Curtis

supported had complained to McCartney about Curtis' work performance. McCartney Dep. at

87–90.

In July 2007, McCartney began receiving complaints from the wife of one of Dr.

Mattson's patients that the patient had not been properly referred to the wound center for

treatment of a bedsore. Curtis Dep. at 88. Following a second complaint from the same client, as well as other performance issues, Curtis received a documented informal counseling from McCartney. *Id.* at Ex. 18. Among the performance issues discussed were failures to return patient calls regarding appointments and prescription refills. *Id.* Based on this informal counseling, Curtis understood that she was to respond to all patient inquiries within forty-eight hours. *Id.* at 86. However, Curtis denies that she "*dropped the ball*" with respect to the bedsore patient. *Id.* at 76.

On September 14, 2007, Curtis was subject to her first formal counseling under Clarian's Corrective Action Policy. McCartney Dep. at 58–59. In this counseling, McCartney counseled Curtis on patient communication issues similar to those addressed in the previous informal counseling. *See generally* Curtis Dep. at 127–30; *see also id.* at Ex. 21. Curtis submitted documentation disputing the alleged communication failures to McCartney, but Clarian contends that this documentation showed actions taken by Curtis following the September 14, 2007 counseling. *See id.* at 127–30. In addition to issues with patient communication, the September 14, 2007 counseling addressed distribution of nursing duties, the time lunch was to be taken, and personal phone calls during work hours. *See id.* at Ex. 21. Curtis had complained previously that some performance issues resulted from her duties with three doctors rather than two, and McCartney stated in the counseling that because Curtis now was supporting only two doctors, she could no longer use unequal distribution of nursing duties as an excuse. McCartney Dep. at 60, 92–93; Curtis Dep. at 41–42 & Ex. 21. Additionally, Curtis was reminded to limit personal phone calls and take lunch when the Clinic phones were turned off from 11:30 a.m.–12:30 p.m. Curtis Dep. at 109–10, 131–32, Ex. 21.

Following the September 14, 2007 counseling, Dr. Mattson reportedly received more patient complaints about Curtis performance. *Id.* at 58–59. McCartney alleges that Dr. Mattson complained numerous times about Curtis not saving messages in patient charts. *See* Resp. at 9–10 (citing Curtis Dep. at 43, 53–54). However, Curtis denies that she had trouble servicing Dr. Mattson's patients appropriately. Curtis Dep. at 60.

On October 29, 2007, Curtis received a written warning from McCartney stemming from alleged failure to respond to a time-sensitive request from a pharmacy. *See id.* at Ex. 25. A written warning is the next step following documented formal counseling in Clarian's Corrective Action Policy and the final step prior to termination. McCartney Dep. Ex. B. Curtis submitted documentation to McCartney opposing the Corrective Action and addressing the prescription in question but, once again, the documentation indicated that Curtis failed to act until October 25, 2007, a week after the initial inquiry. Curtis Dep. at 162–63; Exs. 18, 27. McCartney contends that Curtis was "*cold and impolite*" in discussions with the pharmacy representative. *Id.* at Ex. 25.

On November 15, 2007, McCartney held an informal counseling session with Curtis following alleged complaints from Curtis' coworkers about her attitude and handling of messages. Curtis Dep. at 164. On November 20, 2007, Curtis and McCartney worked together to design an action plan to address Curtis' work performance issues. *Id.* at 165–66. The action plan largely focused on communicating with patients in a timely manner. *Id.* at 166. Curtis acknowledged that she could improve her work performance in this area. *Id.*

From February 29, 2008 to March 4, 2008, Curtis was away from the office. *Id.* at 173. Ashley Marlow ("Marlow") was assigned to cover Curtis' work functions in her absence. *Id.* at

174.  Marlow allegedly found seven prescription-related deficiencies on Curtis' desk and reported them to McCartney.  *Id.* at Ex. 32.  Among the deficiencies were prescriptions without documentation showing that they had been faxed to pharmacies, as well as prescriptions lacking Inbox documentation of any kind.  *Id.*  Curtis contends that the prescriptions were not on her desk when she left for a week, but rather, were retrieved by Marlow from the shredder box.  *Id.* at 172–73.  McCartney denies this, alleging that no call had been placed to open the shredder box.  McCartney Aff. ¶¶ 10–11.  On March 7, 2008, McCartney terminated Curtis for gross misconduct, negligence, and falsification of records. McCartney Dep. at 82.

### D.    Allegations of Discrimination

During her deposition, Curtis stated that she did not believe that any of the doctors she was assigned to support were biased against her because of her race.  Curtis Dep. at 42–43.  Additionally, Curtis stated that she did not believe VanAmburg, her original supervisor at the Neurology Clinic, was biased against her because of her race.  *Id.* at 72.  Curtis has not alleged that any Clarian employee besides McCartney was biased against her or discriminated against her because of her race.

Curtis made informal reports to Greene-Jones and Janine Watkins alleging that McCartney's negative treatment of Curtis was due to her race.  *Id.* at 103–04, 107.  In November 2007, Curtis filed a formal Problem Solving Complaint with Clarian contending that McCartney had "*a problem with diversity in her workplace*."  *Id.* at 152–53.  Additionally, Curtis filed a formal grievance challenging the contents of the September 14, 2007, Corrective Action.  *Id.* at 121.  Clarian never responded to either complaint prior to Curtis' termination.  *Id.* at 118, 167.  McCartney stated that she was unaware of Curtis' November 2007 complaint prior to May 5,

2008, nearly two months after Curtis' termination. Dkt. 34-7 at 34–35. McCartney become

aware of the Problem Solving Complaint for the first time on May 5, 2008, and submitted a

belated response at Clarian's request. Being concerned regarding the nearly six month delay,

McCartney contemplated changing the date on the Claim's response to November 2007, even

though the response was prepared in May 2008. (Exhibit G, CLA002129.) Curtis filed a

grievance alleging discrimination and challenging her termination with Laura Otten of Clarian's

Human Resources Department, but Curtis never received a reply to that grievance either. Curtis

Dep. at 214.

On April 24, 2009, Curtis filed suit in this Court. Curtis alleges that McCartney gave

preferential treatment to Curtis' Caucasian co-workers in a number of ways. Curtis alleges that

McCartney failed to discipline other nurses receiving similar complaints to those received by

Curtis, failed to orient and train Curtis for her job, and failed to take into account Curtis'

responses to the various counseling actions. Resp. at 16. Additionally, Curtis claims that

McCartney required her to go to lunch at a particular time which happened to be two hours after

arrived for work, while other nurses were allowed to go whenever they wanted; that Curtis was

excluded from meetings; that McCartney told other employees to assist Keller and Clouse but

not her; that McCartney "*seldom talked*" to Curtis; and that McCartney "made the statement that

Curtis was the only nurse in the whole neurology clinic that had received complaints from the

patients." *Id.* at 17. In addition to allegations of discrimination directed toward her, Curtis

contends that LaQuana Heard ("Heard"), an African-American nurse formerly under

McCartney's supervision at Clarian, also felt McCartney discriminated against her because of

her race. Curtis Dep. at 104; *see also* Heard Aff. ¶ 16.

The Court adds additional facts below as needed,

## II.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490.  "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).  Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubts as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997).

## III.  DISCUSSION

### A.      Evidentiary Concerns

As an initial matter, both parties challenge certain portions of the opposing party's designated evidence.  Curtis contends that a number of Clarian's exhibits include inadmissible

hearsay statements and lack foundation.  Resp. at 1–5.  Clarian asks the Court to disregard

portions of Heard's affidavit as inconsistent with her deposition testimony.  Reply at 2–6.  The

Court addresses these contentions in turn.

### 1.    Challenges to Clarian's Exhibits

Curtis challenges exhibits 12, 14, 19, 20, 24, 29 and 31 that were used during her

deposition and are being introduced by Clarian in support of this motion.[2]  Resp. at 4.  Curtis

contends that these exhibits are inadmissible because they lack foundation and contain hearsay

statements and, therefore, should be stricken and disregarded.  The Court concludes that these

exhibits should not be stricken. Clarian argues the exhibits are not being offered to prove the

truth of the allegations contained within them, but rather to show that complaints were made,

demonstrating Clarian's belief in Curtis' work deficiencies. The Court will consider the

challenged exhibits in its analysis  for the purpose offered by Clarian.

### 2.    Heard Affidavit

In its reply, Clarian asserts that statements in Heard's affidavit should be disregarded as

inconsistent with her deposition testimony.  Reply at 2–6.  In particular, Clarian requests that the

Court strike paragraph 16 of Heard's affidavit and disregard Curtis' arguments "badly

misconstruing" other portions of the affidavit.  *Id.* at 6.

Turning first to paragraph 16 of Heard's affidavit, Clarian contends that Heard

specifically repudiated that portion of her affidavit during her deposition.  *Id.* at 2.  Paragraph 16

of the Heard affidavit reads as follows:

---

[2]  Curtis also challenged Deposition Exhibits 15 and 32 as unreadable.  Resp. at 4.  In
response, Clarian manually filed these exhibits.  Dkts. 37, 59.  To the extent the manual filings
are legible and admissible, the Court will consider them. However, the Court will not consider
the illegible portions of the exhibits.

I observed favoritism by McCartney towards whites and against persons of color. For example, she would assign more work to persons of color than she did to their white colleagues, she talked down to people of color (for example, she would read a document to them versus telling whites simply to "read this"), she made condescending remarks to persons of color (for example, by stating "You wouldn't understand"), and she wrote up persons of color more often than whites. She also fired persons of color more often than whites (for [sic] example, Angela l/n/u, a Latino, was fired by McCartney after just three (3) months of employment as the Clinic's Receptionist. Another Latino LPN was fired by McCartney after just two (2) months of employment.

Heard Aff. ¶ 16.  However, in Heard's deposition, the following exchange took place:

Q  You talked about paragraph 16 in your affidavit?
A  Yes, sir.
Q  Do you have that in front of you?
A  Yes,  I do.
Q  The first sentence of that paragraph, could you read it?
A   "I observed favoritism by McCartney towards persons of color." [sic]
Q   Do you still stand by that?
A  After my testimony, no, I can't say that.

Heard Dep. at 117.  Clarian contends that this statement is an express repudiation of paragraph 16 of her affidavit.  Curtis tacitly concedes that Heard repudiated her statements from paragraph sixteen of her affidavit.  Surreply at 2 ("*When asked if there was anything else besides paragraph 16 in her Affidavit that she would change, Heard responded no*.").  The Court concludes that paragraph 16 should not be stricken; however, it will be viewed in light of Heard's later deposition testimony.

As to the rest of Heard's affidavit, when deposition testimony contradicts a previously-submitted affidavit, a court may use the deposition testimony and disregard the affidavit in evaluating a motion for summary judgment.  *See Darnell v. Target Stores*, 16 F.3d 174, 177 (7th Cir. 1994) (finding that subsequent deposition testimony "showed [affiants'] affidavits to be without factual support").  To the extent that Heard's deposition testimony contradicts her

affidavit, the Court will disregard Heard's affidavit and rely instead on her subsequent deposition testimony.  *Accord. id.*

**B.      Curtis' Discrimination Claim**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2 (2010).  Curtis alleges that Clarian discriminated against her based on her race, African-American.  To prove a claim of race discrimination under Title VII, a Curtis may use either the direct method of proof or the *McDonald Douglas* method of indirect proof.  *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009).

**1.      Direct Method**

To prevail under the direct method, Curtis must present facts showing that Clarian's decision to take an adverse employment action against Curtis was motivated by race.  *Gusewelle v. City of Wood River*, 374 F.3d 569, 574 (7th Cir. 2004).  "The focus of the direct method of proof is . . . whether the evidence 'points directly' to a discriminatory reason for the employer's action."  *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008).  The presented facts can take the form of direct or circumstantial evidence.  "Direct evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus."  *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003).  Curtis admits that no direct evidence exists in this case. Resp. at 21.  Therefore, the Court turns to address direct proof through circumstantial evidence.

"Direct proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion . . . but also includes circumstantial evidence

which suggests discrimination albeit through a longer chain of inferences." *Atanus*, 520 F.3d at 671. Curtis may rely on a "convincing mosaic" of circumstantial evidence as direct proof of discrimination. *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998). Circumstantial evidence used to construct a "convincing mosaic" can include suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and inconsistent explanations or behavior. *See Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994); *Nanavaty v. City of Indianapolis*, No. IP-99-1521, 2001 WL 1781924, at *12 (S.D. Ind. Dec. 19, 2001). However, the circumstantial evidence in the convincing mosaic "must point directly to a discriminatory reason for the employer's action." *Koszola v. Bd. of Educ. of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004).

Curtis contends that the suspicious timing of her termination, inconsistent statements regarding her training and performance evaluations, and treatment of Heard—another member of the protected group—combine to show a "convincing mosaic" of evidence of discrimination. Although Heard's affidavit alleges discrimination, in her deposition Heard repeatedly stated that she did not believe that McCartney discriminated against her because of her race. Heard Dep. at 27, 60, 73–74, 94, 97–98, 100, 104–05, 117. As such, Heard's statements fail to provide support to the convincing mosaic inquiry. *Accord. Darnell*, 16 F.3d at 177 (contradictions between affidavit and deposition indicate lack of factual support for affidavit statements).

As to the "suspicious timing" of her termination, Curtis points to the fact that she was fired less than a year after McCartney became her supervisor, even though neither patients nor doctors complained about her work prior to McCartney's arrival. Resp. at 10–11, 22. However,

Curtis admits that under Van Amburg, there were areas of her work performance to improve. Curtis Dep. at 66–70. Clarian provided written counseling to Curtis for similar issues to those leading to her termination. *See* McCartney Dep. at 58–60. Given Clarian's attempts to address Curtis' work performance issues prior to her termination and the fact that McCartney was her supervisor for approximately 8 months, the Court is not convinced that the timing of Curtis' termination is sufficiently suspicious. *See Dickerson v. Walgreen Co.*, No. 4:09-cv-44, 2009 WL 899664, at *12 (S.D. Ind. Mar. 31, 2009) (termination following a two-month investigation is not suspicious timing); *Raisor v. Ind.-Am. Water Co., Inc.*, No. 4:06-cv-180, 2008 WL 4098981, at *11 (S.D. Ind. Aug. 29, 2008) (seven month time lag is not suspicious timing). Even if it were, "suspicious timing alone is rarely sufficient to create a triable issue" as to discrimination. *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (citing *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008)). Although Curtis makes much of Clarian's slow response to her problem-solving complaint, there is no evidence that McCartney was aware of the problem-solving complaint when she decided to terminate Curtis' employment, and Curtis has not alleged that any other Clarian employee discriminated against her. *See* Dkt. 43-7 at 34–35. As such, the timing of the problem-solving complaint does nothing to strengthen Curtis' contention of suspicious timing.

Turning to Curtis' allegations of inconsistent statements, Curtis first points to differences in the statements made about training by McCartney and Greene-Jones, McCartney's counterpart in the Orthopaedic Clinic. Resp. at 24–25. However, Greene-Jones's attitude on training sheds little, if any, light on Curtis' situation in the Neurology Clinic. Additionally, Curtis has not brought forth any evidence suggesting that McCartney's attitude toward training was directed at

Curtis alone because of her race, rather than towards all the Triage Nurses in the Neurology Clinic. Curtis also contends that VanAmburg's and McCartney's opinions about her work performance were inconsistent. *Id.* at 25–26. However, these "inconsistencies" alone fail to point directly to discriminatory intent. *See Koszola*, 385 F.3d at 1109. In short, the Court concludes that Curtis fails to construct a convincing mosaic of evidence of racial discrimination under the direct method. Therefore, the Court moves on to evaluate whether Curtis has created a genuine issue of material fact under the indirect method.

### 2. McDonald Douglas Indirect Method

To prevail under the indirect method of proof, Curtis first must make out a *prima facie* case of racial discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she suffered an adverse employment action; and (4) similarly-situated persons not in the protected class were treated more favorably. *Gusewelle*, 374 F.3d at 574 (citing *Steinhauer v. DeGolier*, 359 F.3d 481, 484 (7th Cir. 2004)); *see also McDonald Douglas v. Green*, 411 U.S. 792, 802–04 (1973). If Curtis makes a *prima facie* case of discrimination, the burden shifts to Clarian to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Gusewelle*, 374 F.3d at 574. If Clarian can do so, the burden shifts back to Curtis to present sufficient evidence to show that Clarian's proffered reasons are merely a pretext for discrimination. *Id.*

### a. Prima Facie Case

The parties do not dispute that Curtis meets two of the *McDonald Douglas* requirements. As an African-American, she is a member of a protected class, and she was subjected to termination of employment, an adverse employment action. However, Clarian contends that

Curtis failed to meet Clarian's legitimate performance expectations and cannot identify a similarly situated employee who was treated more favorably, thus failing to meet the second and fourth requirements of the *McDonald Douglas* analysis.

The second prong of the *McDonald Douglas* analysis requires Curtis to show that she was qualified for the position at issue. *Gusewelle*, 374 F.3d at 574. In cases involving outright termination of employment, this prong has been interpreted to require that Curtis show she performed her job according to the employer's legitimate performance expectations. *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 364 (7th Cir. 2009). Citing performance issues as the reason for Curtis' termination, Clarian disputes that Curtis was performing her job according to its legitimate expectations. In response, Curtis contends that the communication issues cited by Clarian were caused by problems with the phone system, as well as communication lapses by other people she relied on to do her job, such as doctors and medical assistants, and adjustment issues with the new computer charting system. Resp. at 28–29; *see also* Curtis Dep. at 35–36; McCartney Dep. at 86; VanAmburg Dep. at 23–29. In addition, Curtis has introduced evidence indicating that her performance evaluations prior to McCartney becoming her supervisor were satisfactory and that neither of Curtis' assigned doctors complained about her performance. *See* VanAmburg Dep. at 20–21, 38–40, 42–43; McCartney Dep. at 87, 89–90. Viewing the evidence in the light most favorable to Curtis, the non-moving party, the Court concludes that a genuine issue of material fact exists as to whether Curtis was performing her job according to Clarian's legitimate expectations.

Under the fourth prong of the *McDonald Douglas* analysis, Curtis must show that similarly situated employees not of the protected class were treated more favorably. *Gusewelle*,

374 F.3d at 574. Generally, to show that an employee is similarly situated, it must be established that "the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000). Curtis argues that "[r]equiring her to identify a similarly situated employee may be an overly onerous burden . . . that can be excused at the *prima facie* stage." Resp. at 31 (citing *Nwanna v. Ashcroft*, 66 F. App'x 9, 13 (7th Cir. 2003)). To meet her burden of demonstrating that there is someone who is directly comparable to her in all material respects, the court must "look at all relevant factors, the number of which depends on the context of the case. See *Radue*, 219 F..3d at 617. However, the burden for a prima facie case is not intended to be "onerous". *See, Goodwin v. Gen. Motors Corp.*, 275 F.3d 1005, 1012 (10th Cir. 2002).

In this case, there are only two employees who could meet the definition of similarly situated employees based on their supervisor and job responsibilities; Keller and Clouse, both Caucasian Triage Nurses in the Neurology Clinic. Curtis Dep. at 62–63; McCartney Dep. at 29. As evidence of less favorable treatment, Curtis points out a number of differences between McCartney's treatment of her as opposed to Keller and Clouse. *See* Curtis Dep. at 107 (excluded from meetings), 205 (required to take lunch at a specific time), 207 (given less help from other employees); 208 (McCartney "seldom spoke" to her). McCartney alleges that no other nurse received complaints to the extent that Curtis did. McCartney Aff. ¶ 8.

Curtis contends that Keller and Clouse are similarly situated employees and there is some evidence that either Keller or Clouse "engaged in similar conduct" as Curtis without being

terminated.  *See Radue*, 219 F.3d at 618.  Curtis contends that Keller and Clouse received complaints and were not disciplined.  Curtis Dep. at 189; McCartney Dep. at 30. Curtis held the position of  Triage Nurse in the Neurology Clinic,  as did two other nurses, Keller and Clouse both of whom were Caucasian. The three nurses worked in a very small area where Curtis personally overheard McCartney when she talked to the other two nurses about their patient complaints and Curtis observed no adverse consequences for her co-workers. Curtis also took telephone calls from patients who complained about her co-workers. Curtis contends that when Scott from Caremark encountered difficulty in reaching Keller or Clouse and complained to McCartney, McCartney dismissed his complaint, simply assuming that Scott was lying. However, McCartney used complaints from Scott to discipline Curtis. Curtis has brought forth some evidence that Keller and Clouse had performance issues. Again, viewing the evidence in the light most favorable to Curtis, the non-moving party, the Court concludes that a genuine issue of material fact exists as to whether in this case, similarly situated employees outside of the protected class were treated more favorably.  The Court finds Curtis has established the final element of the *prima facie* case.

**b.        Non-Discriminatory Reason for Termination and Pretext**

The *McDonald Douglas* inquiry continues and the burden shifts to Clarian to articulate a non-discriminatory reason for Curtis termination.  *Gusewelle*, 374 F.3d at 574.  Clarian contends that Curtis was discharged for work performance issues, including failure to properly chart nursing actions and mishandling of prescriptions and falsification of records.  *See, e.g.*, McCartney Aff. ¶¶ 8–10.  This is sufficient to meet Clarian's burden under the second step of the *McDonald Douglas* framework.

As Clarian has articulated a non-discriminatory reason for Curtis termination, the burden shifts back to Curtis to demonstrate that Clarian's reason is merely pretext for racial discrimination. *Gusewelle*, 374 F.3d at 574. An employer may take negative employment actions "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Malacara v. City of Madison*, 224 F.3d 727, 731 (7th Cir. 2000). Therefore, "[t]he focus of the pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004). An employee's own disagreement with her employer's assessment of her performance is insufficient to create a triable issue of pretext. *Holley v. Pritchett*, No. IP-1-889, 2004 WL 2757871, at *17 (S.D. Ind. Sept. 30, 2004) (citing *Pitasi v. Garnter Grp., Inc.*, 184 F.3d 709, 719 (7th Cir. 1999); *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1460–61 (7th Cir. 1994)). Curtis "must offer evidence to raise a reasonable inference that her employer did not honestly believe that her performance was poor."

Prior to McCartney becoming Curtis' supervisor, Clarian had no significant performance issues with Curtis and she had no disciplinary complaints regarding her work perfromance. During the term when McCartney was her supervisor and several months prior to her termination, Curtis filed a Problem Solving Complaint dated October 29, 2007 alleging "*problems with diversity*" as the motivation behind McCartney's disciplinary actions. In the complaint, Curtis not only disputed the poor performance allegations but provided examples of treatment she perceived as discriminatory. Clarian's Human Resource department failed to respond or otherwise address any of McCartney's concerns prior to her termination. Although

McCartney may not have seen the complaint prior to terminating Curtis, Curtis' notice to Clarian of perceived pretext in the performance evaluations is relevant evidence.

To establish that employer's proffered reason for its action was pretext for discrimination under Title VII, plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either: (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et. Seq. *Shah v. Adecco*, 682 F. Supp. 2d 435 (D. Del. 2010.)

McCartney made the very serious allegation that Curtis had "falsified records" as a reason for termination. When requested by Human Resources to clarify the meaning of "falsifying" as used in the termination documentation, McCartney elected not to respond. A jury might conclude that McCartney did not honestly believe that Curtis had falsified records. Given the various reasons McCartney gave for termination and McCartney's exclusion of Curtis from nursing meetings and other discriminatory behaviors alleged by Curtis, Curtis has provided sufficient evidence for which a fact finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons of termination for failure to properly chart nursing actions, mishandling of prescriptions and falsification of records or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. As such, Clarian is not entitled to summary judgment.

## IV.  CONCLUSION

For the reasons noted herein, Defendant's Motion for Summary Judgment [Dkt. 33] is

**DENIED**.

SO ORDERED.

Date:___2/25/2011_____

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution to:

Matthew J. Kelley
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
matthew.kelley@ogletreedeakins.com

Kristin B. Keltner
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
kristin.keltner@odnss.com

Steven  Sams
STEVEN SAMS, P.C.
stevensamslaw@att.net